No. 30,495.

WILLIAM L. GOODWIN, *Appellee*, v. THE SINCLAIR PIPE LINE COMPANY, *Appellant*.

(12 P. 2d 842.)

Opinion filed July 9, 1932.

*Carl E. Ziegler*, of Coffeyville, and *Chester Stevens*, of Independence, for the appellant.

*Thurman Hill*, of Topeka, *W. N. Banks*, *O. L. O'Brien* and *Walter L. McVey*, all of Independence, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The proceeding was one by a workman to obtain compensation for personal injury. The commissioner of compensation denied compensation. The district court awarded compensation for permanent disability. The employer appeals, and contends there was no substantial evidence to sustain the judgment of the district court, which was for $309.43 accrued compensation, and for $6 per week for 355⅞ weeks, a total of $2,442.86.

The workman was injured on March 28, 1930, and did not work for seven or eight days. No claim for compensation was made for that injury. On the advice of a physician the workman returned to work and worked until July 15, when he was laid off because of a reduction in the employer's laboring forces. Commencing July 24, claimant worked for a railroad company for three days. In October he did some light work, and from October to the time of the hearing before the commissioner, which occurred on October 29, he did no heavy work.

The claim for compensation was for an injury received on July 11, four days before plaintiff was discharged. The foreman testified he had given instructions to his men always to come to him if they got hurt. The foreman could not say he had given this instruction to the claimant personally, but a witness for the claimant who was working with the claimant testified "that instruction was out up there." On and after July 11 the foreman was accessible, but claimant said nothing to him about the injury. The claimant said he told some fellow workmen, but he made no complaint to anyone in authority. The claimant made no attempt to get in touch with his foreman until he left the employment of the railroad company. He said he saw the foreman playing golf one evening, but did not interrupt him, and finally wrote a letter to the foreman about the last of July. A demand for compensation was made on August 14.

The injury in March consisted of a broken rib. Claimant testified as follows:

"I had pain in the chest before, when I got hurt on the 24th [March 28], and that pain was there until I got hurt on the 11th of July. The pain would be constant for a long time, and would then come and go; and I had this pain off and on from along in April until now; my chest was discolored—black and blue—when I was hurt the first time."

Claimant further testified that after the injury in March he

shirked, at times, in doing his regular work—had to shirk heavy lifting some. He also testified he had lost about thirty pounds in weight since April, and was restless at night.

The written claim for compensation was filed on September 25. As indicated, the claim was for the injury sustained on July 11. The claim stated the claimant was injured while engaged in lifting a sack of cement, and described the injury as follows:

"Refractured ribs that had been fractured while working for the company in the latter part of March. This injury produced intercostal neuritis and lung trouble."

Claimant testified the injury occurred while he was unloading cement from a box car to a wagon. His first account was that he picked up a sack, and kind of wrenched himself, and "felt like something busted in here" (indicating). He had to let the cement down to the floor, he stood there a few minutes, and then worked the rest of the day—was not able to work, but had to do it. He was hurt in the chest and back.

Claimant's second account of the accident was that the cement was "kind of jammed in behind," he pulled it out, "and something caught me in the back there" (indicating). He let the sack down to the floor. He got hurt on the inside a second time, and it "hurt a little worse the last time [July 11] than it did the first time" [March 28].

Claimant's third account of the accident was that the sack was kind of jammed in, he had to use force to get it out, "sort of jerking it loose," and "something popped."

The examiner then tried to find out where the claimant was injured. The examiner had him stand up and indicate, and he pointed to his chest. The examiner asked a physician who was present to describe the region, and the physician said: "Precordial region, over the heart, anterior to the axillary line." The following then occurred, the examiner asking questions and the claimant responding:

"Q. You felt that popping in your chest—wasn't in your back? A. The popping was in here—strained my back.

"Q. How do you mean—indicate your back? A. Right here (indicates)."

A witness for claimant testified as follows:

"I was working with claimant somewhere along about July 11, at Sycamore, handling cement; three of us were working, taking it out and putting it on a wagon. He and I were working the north end of the car, and switching around had bumped the sacks in further, and hard to get at; I seen him working, and

all at once he let his sack down; I asked him what was the matter, and he said he hurt his back and chest."

The claimant testified he was hurt on the 11th of July, just before noon; he continued working that day, and he worked up to the 15th, when he was laid off. He also testified he went to Doctor Morehead on the 12th. This was contrary to his own testimony, to the testimony of Doctor Morehead, and to the testimony of claimant's wife. Doctor Morehead was not consulted until the latter part of July. Mrs. Goodwin testified her husband went to work on the 12th of July, worked four or five days after he was hurt, and consulted a doctor after he was laid off. Evidently what claimant had in mind was that he consulted a doctor the next day after he was hurt the first time.

Mrs. Goodwin testified her husband was hurt in April [March], and got some better, but he was doctoring all the time, and had been restless since he was hurt in March. She noticed loss of weight and changed physical appearance, and he seemed worse after he was hurt in July. Claimant testified that on July 11 a violent pain struck him "all of a sudden," that the injury affects him so that if he happens to move just wrong the pain catches him, and that it has weakened his physical strength.

A fellow workman testified for claimant as follows:

"I worked with claimant at Sycamore in July. I did not know anything about him getting hurt. He might have told me, but I did not see him get hurt."

Another workman testified for claimant as follows:

"I worked with claimant for the Frisco railroad at Neodesha in July, 1930. We were working on the section and he was tamping ties. He worked three days, and quit on the 24th [26th] day of July. He did his work good; he did not complain of any pain that I know of. The next morning after he quit he told me he was not feeling well and had a hurting in his side."

Claimant consulted Doctor Morehead in the latter part of July, and the only inference derivable from the evidence is that the consultation occurred after claimant quit working for the railroad company on July 26. Doctor Morehead testified he examined claimant and found a lump on the upper part of the chest, in the precordial region just below the nipple—quite a lump, on what he would say was the fifth or sixth rib. There seemed to be a marked callus at that place, large enough to be seen by the eye. The callus was not excessive. He could feel the callus. He just felt of the

claimant. Claimant had a splendid physique and looked like a prize fighter.

The foregoing includes every detail of Doctor Morehead's physical examination of claimant. From the physical examination Doctor Morehead made the following physical findings: The lump had the appearance of an old fractured rib of several months' duration; claimant had an apparent old fracture of one of his ribs; there were no signs of a refracture, and signs were of only one fracture. There was no crepitation in the site of the old fracture. The doctor had no X-ray, but from external appearance it must be a good osseous union. There was a weak spot from the former injury. There was evidence of tenderness. The nerve seemed to be tender. There was nothing but the lump to affect nerve centers.

The foregoing includes all the physical facts known to Doctor Morehead on which to base an opinion respecting what was the matter with claimant. All else was subjective—what claimant told the doctor. What claimant told the doctor was not related. If it included a statement that in July something "busted" or "popped" inside of claimant, or that claimant had wrenched himself, or had a sudden severe pain while he was lifting or jerking a sack of cement, the only thing affecting claimant when the doctor examined him was the March injury.

The doctor's diagnosis was that the lump would affect nerve centers. If claimant was injured in March, and reinjured in April, the doctor would expect to find tenderness and soreness. The lump had apparently affected the intercostal spaces, which would very likely cause neuritis, and to which the doctor attributed claimant's loss of weight. Claimant would have pains, just like over any old sore, not necessarily constant, and the pain might be in the intercostal muscles.

The injury specified in the written claim for injury was twice referred to in the examination of Doctor Morehead:

"Q. He states in here that he refractured a rib—did you find any signs of a refracture? A. No, sir.

. . . . . . . . . . . . .

"Q. And taking the subjective symptoms, that wouldn't be a good diagnosis, would it? A. Would not.

"Q. And you wouldn't be in position to say whether the man is disabled as a result of this claimed injury the 11th or not? A. I wouldn't say positive. I would think that would have a whole lot to do with it. He had neuritis before that."

The claimed injury was refracture. Doctor Morehead definitely excluded refracture, and the concluding portions of his decision, based both on an examination and on history of the case, follow:

"As a result of my examination I came to the conclusion he is suffering from this injury. . . .

"I base my opinion on thirty-three years' practice, and having seen a number of injured-rib cases. The lump on his chest was in an ugly-looking condition, and from his history it is affecting the nerve center materially. . . I found nothing else to affect the nerve centers."

The doctor's prognosis was as follows:

"It is problematical when it will be well; I feel rather sure that it is permanent, and he will be affected for at least eight years. I do not know how to cure this condition; I doubt if an operation would do any good."

Claimant was examined by an osteopathic physician, Dr. H. S. Wiles. Doctor Wiles said, "It was July 16 or August 16 I examined. him." Evidently the expression "or August 16" was a correction of date. July 16 was the day after claimant was laid off, and it was after claimant worked for the railroad company that he asked for medical attention, and went to Doctor Morehead.

It is difficult to distinguish the physical facts which Doctor Wiles said he found from his conclusions. The doctor said that apparently a couple of ribs had been broken. The injury was just above the mid-axial line. There was a little protuberance visible, which he found by palpation. There was a growth on the bone, which he called exostosis. Soreness was discovered by palpation. Claimant complained of tenderness on pressure. The doctor did not take an X-ray, or examine claimant under a fluoroscope.

Doctor Wiles said he "found" a lesion of the seventh dorsal nerve. The nerve was injured from pressure. The claimant had neuritis, which is an inflammation of the nerve resulting from irritation and injury. Neuritis is caused by nerve pressure—nerve irritation. The condition was abnormal, and went to the whole region of the intercostal nerve on that lesion. The doctor said:

"I think there is nothing more serious than an injured rib; it has affected the spinal nerves as well as the intercostal region. This condition would cause a loss in weight, and if he lost thirty or thirty-five pounds since April, I would expect it to result from the injury I found."

Doctor Wiles specified no site of nerve pressure except the place where the rib was injured. He said the injury would affect the lining of the lung by reflex irritation from the involuntary nervous

system; but the doctor did not say claimant had any irritation of the lung lining. The doctor said the injury would not affect inspiration, except when taking a deep breath; but the doctor did not say he tested claimant by having him take a deep breath. The doctor did not ask claimant about diseases. The doctor said neuritis may be aggravated by absorption of poisons in the body, and if claimant did not have injury causing disturbance of the seventh dorsal nerve, it would come from toxemia, or from exposure to cold.

Doctor Wiles' prognosis was as follows:

"I think the injury is permanent, that is, the pain will affect him more or less on exertion. . . . It would be difficult to base a curative treatment without X-ray to tell what the condition is now."

The last part of the doctor's statement indicates he knows that the way to find out what a physical condition is is by use of the instrumentality which will reveal the actual condition—an instrumentality to which the doctor did not resort.

The substance of Doctor Wiles' testimony is the same as the substance of Doctor Morehead's testimony—physical injury involving a rib, affecting a nerve, and causing neuritis. Doctor Wiles testified there was indication claimant had the injury within thirty days of the examination. What the indication was was not disclosed. Whether it was sufficient to warrant affirmation of injury within thirty days was not disclosed. Doctor Wiles made no such affirmation. In fact, the doctor prudently said he did not know when the injury occurred. If the injury occurred within thirty days of the examination, it occurred after claimant was discharged by the employer, and the claimant was out of court.

Doctor Wiles said if claimant had lost thirty or thirty-five pounds in weight since April, the doctor would expect it to result from the injury he found. There was no pretense claimant had lost thirty pounds in weight after July 11, and the necessary inference is that the injury Doctor Wiles found occurred before July 11. There was but one injury before July, and that occurred on March 28.

Claimant was examined, for the employer, by two physicians, in the presence of each other, the last part of August or near the first of September. One of the physicians, Doctor Dickinson, testified:

"We first took a history, when he was injured, how he was injured, and what his complaints were at that time, and at the time of the examination he stated he received an injury in March, and from what he said I presumed that he had a fractured rib; he worked for awhile until about the middle of July, and

was then laid off. He said he had an injury to his chest a few days or a week before he was laid off. He said he had a lot of pain in his chest, was weak, and was unable to carry on his work. Examined head, eyes, chest, abdomen, extremities, a general physical examination, and took an X-ray. His teeth were what we call 'oral sepsis,' very marked, great number of crowns, lot of pyorrhea around the base of the crowns, and the gums exuded pus on pressure. . . . That would cause a low-grade infection—toxemia pouring poisons in the system; the condition of his mouth indicates his appetite would not be very good; he would have a bad odor of breath. The only thing that I could find to account for a loss of appetite was that he had a filthy, infected mouth."

The other physician for the employer, Doctor Flack, testified:

"This man has a very bad mouth, with many crumbled teeth, marked detraction of the gums, and pyorrhea. . . . If he has lost thirty pounds in weight, there are several sources to account for it; he has a bad mouth with a lot of rotten teeth, which impair his digestive functions."

The district court was not authorized to reject this testimony. The claimant had his mouth with him at the hearing, and had his own doctors there. He tendered no inspection. He tendered no medical testimony to refute the testimony relating to physical facts which then and there existed or did not exist, and under the well-understood rule the claimant is not privileged to deny existence of the oral sepsis described.

The physicians for the employer gave other testimony with respect to facts ascertained by use of the unaided senses. The claimant heard the testimony, was able to dispute it if not true, and did not dispute it. The claimant's reflexes are present and normal, and he bends without difficulty. Except for the callus his chest wall is normal. The callus does not interfere with breathing, and he takes a deep breath without difficulty or evidence of pain. Breathing exercises the chest wall. The ribs are in motion, and in claimant's case the motion of his ribs is normal and the expansion in each side is the same. There were no adventitious sounds, and no sounds in the lung itself. There was no sign of diminution of mobility of the diaphragm, which accompanies pleuritic conditions.

The physicians for the employer put claimant under the X-ray to see if there was anything abnormal inside of his chest. They used a fluoroscope because it is more satisfactory than a flat picture. Observation by this means revealed nothing extraordinary for one who had a rib fractured without displacement, the union was firm and solid, there were no adhesions, and except for the callus there was nothing abnormal about the chest.

The findings just stated were of what the two physicians said they saw. It may be assumed the claimant was not in position to refute those findings. The district court might discount or reject the opinion evidence of the employer's physicians based on what they said they saw, and this court is obliged to acknowledge that records come here showing that competent triers of fact have rejected medical findings as invented for the purpose of the case. In this instance the integrity of the fluoroscope examination was not questioned at the hearing before the examiner. The findings did not contradict any finding of physical fact ascertainable by observation, reported by claimant's physicians. The findings were corroborative of the physical facts to the extent that the claimant's physicians observed them. Therefore, on the face of the record, the district court was not at liberty to reject the results of the fluoroscope examination which have been stated. Other testimony on behalf of the employer need not be recited or considered.

The foregoing analysis of the testimony has been made, not for the purpose of weighing evidence or resolving conflicts in evidence, but to discover what the evidence really was, to state it, and in a few instances to bring out some inescapable inferences from the evidence. This court has no hesitation in declaring the evidence precluded the judgment of the district court.

The claim for compensation stated the claimant suffered a refracture of ribs fractured while. he was working for the employer in March. So the place of fracture in March was specified as the place where claimant was injured. There was no evidence of refracture, and the evidence for claimant negatived refracture. The claim for compensation stated the injury complained of produced lung trouble, which was not described. There was no evidence the claimant had lung trouble of any description. The claim for compensation stated the injury produced intercostal neuritis. There was evidence he had intercostal neuritis, but the testimony of claimant's witness, Doctor Morehead, put claimant out of court. There was nothing to affect a nerve and produce neuritis except the injury sustained on March 28. The time for making written claim for compensation expired on June 26.

The testimony of Doctor Wiles fully corroborated the testimony of Doctor Morehead. Doctor Wiles knew of nothing more serious than an injured rib, and it had caused intercostal neuritis. The site of injury was definitely located by the protuberance or bone

growth—the callus which all the doctors found. Doctor Wiles posited no other cause of neuritis, and there was no evidence that what claimant did on July 11 created the condition which produced the pressure on the nerve which caused neuritis.

No doctor gave testimony that jerking a sack of cement, or a wrench by lifting a sack of cement, would fracture or refracture a rib, or produce a callus or protuberance or exostosis such as was found at the site of the old injury, or affect an existing callosity, or create an additional source of nerve pressure.

Besides what has been said the testimony for claimant left out of account an adequate cause of neuritis independent of trauma. The testimony for claimant was that if he did not have nerve pressure producing neuritis, caused by injury, the disturbance would come from toxemia. An undisputed source of toxemia was established—the oral sepsis. The testimony for claimant also was that the absorption of poison in the body would aggravate neuritis. Poison pouring into claimant's system from his septic mouth was established. The superficial examination of Doctors Morehead and Wiles did not extend to this patent cause of neuritis. If the doctors had expressed opinions that claimant's neuritis was caused or aggravated by recent trauma, the opinions would be of no weight. They would be devitalized by failure to take into account evidence indispensable to a conclusion of value. (*Kelsey v. Armour & Co.,* 119 Kan. 837, 241 Pac. 453.) The doctors, however, predicated neuritis upon the rib fracture. Toxemia from the oral sepsis would aggravate that neuritis, and known causes in active operation accounted for all the claimant's trouble, pain, restlessness, loss of weight, etc. The evidence excluded existence of any third cause, and the evidence warrants but one rational conclusion: The sudden severe pain claimant suffered on July 11 was an acute manifestation, on exertion, of neuritis caused by the injury in March and aggravated by the oral sepsis.

The judgment of the district court is reversed, and the cause is remanded with direction to deny compensation.